## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

OLECIA JAMES                                                    PLAINTIFF

V.                                                    NO. 4:19-CV-66-DMB-RP

THE CLEVELAND SCHOOL
DISTRICT, et al.                                                DEFENDANTS

### ORDER

Olecia James tied for third place in the academic rankings of the 2018 graduating class of Cleveland Central High School. Claiming that she would have been class salutatorian but for violations of her equal protection and due process rights, James sued the Cleveland School District, its superintendent, and various School District officials seeking monetary, injunctive, and declaratory relief. The defendants have moved for summary judgment on all of James' claims. Because James cannot establish a violation of her constitutional rights, summary judgment will be granted.

### I
### Summary Judgment Standard

A court shall enter summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (cleaned up).

The "party seeking summary judgment always bears the initial responsibility of demonstrating the absence of a genuine issue of material fact." *Id*. (alterations omitted). When the movant would not bear the burden of persuasion at trial, he may satisfy his initial summary judgment burden "by pointing out that the record contains no support for the non-moving party's claim." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019). If the

moving party satisfies his initial burden, the nonmovant "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Jones*, 936 F.3d at 321 (cleaned up).

## II
## Factual Background[1]

For more than fifty years, the Cleveland School District in Cleveland, Mississippi, has operated under a desegregation order issued in *Cowan v. Bolivar County Board of Education*, which enjoins the School District from discriminating based on race or color.[2]

Beginning in 1989, students in the School District attended schools based on court-ordered attendance zones with a majority-to-minority transfer policy.[3] The School District operated two middle schools—D.M. Smith Middle School and Margaret Green Junior High—and two high schools—Cleveland High School and East Side High School. Doc. #185-15 at ¶¶ 2, 5; Doc. #185-16 at 89.

In May 2011, the United States of America, citing the enrollment statistics at D.M. Smith and East Side, filed a motion in *Cowan* to compel the School District to desegregate its schools.[4] Finding that the School District had "attempted" to comply with various desegregation orders but failed to desegregate its middle schools and high schools, United States District Judge Glen Davidson directed the School District to propose a desegregation plan.[5] The School District proposed a plan which would place certain high-level academic offerings at East Side and D.M.

---

[1] Although the defendants filed separate motions for summary judgment, the motions are supported by near-identical exhibits. James' responses to the motions all rely on the same exhibits. Accordingly, the relevant factual background for each motion is the same.

[2] No. 2:65-cv-31, at Doc. #33 (N.D. Miss. July 22, 1969). This Court takes judicial notice of its own records. *United States v. Huntsberry*, 956 F.3d 270, 285 (5th Cir. 2020).

[3] *Cowan*, No. 2:65-cv-31 at Doc. #12 at 4–7.

[4] *Cowan*, No. 2:65-cv-31 at Doc. #6 at 2, 43.

[5] *Cowan*, No. 2:65-cv-31 at Doc. #43 at 39–40.

Smith for the purpose of drawing white students to those schools.[6]  The United States sought consolidation of the schools.[7]

In January 2013, Judge Davidson rejected both proposals and modified the desegregation order in *Cowan* to permit "any child within the District to enroll in either of the high schools or junior high schools, regardless of the racial composition of the student body at such schools."[8] Following Judge Davidson's order, the School District maintained a policy of "open enrollment" under which students could choose the middle schools and high schools they attended.  Doc. #185-4 at 6–7.  Under this open enrollment policy, East Side and D.M. Smith maintained almost exclusively African American enrollments.[9]  Margaret Green and Cleveland High each maintained enrollments of approximately half white and approximately half minority.[10]

On May 13, 2016, this Court, finding that East Side and D.M. Smith were single-race schools due to past segregation, directed the School District to consolidate the middle schools and consolidate the high schools.  *See Cowan v. Bolivar Cnty. Bd. of Educ.*, 186 F. Supp. 3d 564, 620–21 (N.D. Miss. 2016).  Beginning with the 2017-2018 academic year, the School District consolidated the high schools into a single high school, Cleveland Central High School.  Doc. #193-5 at 1.  The facts of this case concern the assignment of course quality points for courses taken at the high schools and middle schools prior to consolidation.

### A.  School District Grading and Reporting Policies

Pursuant to state law, "[t]he Mississippi Department of Education … provide[s] curriculum

---

[6]  *Cowan*, No. 2:65-cv-31 at Doc. #44.

[7]  *Cowan*, No. 2:65-cv-31 at Doc. #81 at 3–4.

[8]  *Cowan*, No. 2:65-cv-31 at Doc. #78 at 8–9.

[9]  *See Cowan*, 2:65-cv-31 at Doc. #216-1 at PageID 4495–96.  The Court takes judicial notice of the enrollment statistics submitted to the Court as directed by the desegregation order in the *Cowan* case.  *See United States v. Louisiana*, 718 F. Supp. 525, 533 (E.D. La. 1989) (taking judicial notice of enrollment statistics published by school).

[10]  *Cowan*, No. 2:65-cv-31 at Doc. #216-1 at PageID 4493, 4497.

frameworks to set forth expectations of students by specifying course titles and content." 7 Miss. Admin. Code Pt. 3, R. 28.1. Consistent with this responsibility, the Department of Education provides an annual "list of the Approved Courses for the Secondary Schools of Mississippi to each school district. This list contains all approved courses that can be offered in the Mississippi secondary schools." 7 Miss. Admin. Code Pt. 3, R. 28.2. However, individual school districts may "implement[] innovative programs authorized by the State Board of Education." *Id*. The approved courses are assigned a six-digit course code. *See* Doc. #230-19 at PageID 7011.

According to the Department of Education's graduation requirements:

> Contents of each required and elective course must include the core objectives identified in the *Mississippi College- and Career-Readiness Standards*. Course titles and identification numbers must appear in the current edition of the Approved Courses for Secondary Schools of Mississippi.

Doc. #241-9 at PageID 7534. The Department of Education further requires that "[s]chools seeking approval to offer a course not listed in the *Approved Courses for the Secondary Schools of Mississippi* must complete the course development process." Doc. #241-10.

Each academic year, a group of teachers, principals, and administrators in the School District submit to the School District's School Board a proposed curriculum guide for that academic year. Doc. #185-14 at 19–20. The curriculum guide lists, among other things, the classes to be offered in the School District that year, designates the classes as Accelerated, Advanced, or Regular, and provides the standards for determining class ranks and class awards. Doc. #230-7 at PageID 6834–35. The School Board then approves the guide. *See* Doc. #185-16 at 6.

The standards set forth in the curriculum guides are to be controlling within the School District. Doc. #232-1 at 66. But according to former Assistant Superintendent Lisa Bramuchi, in preparing the curriculum guide, "[s]ome classes that were always advanced or accelerated might have been left off." Doc. #185-14 at 41–42. In such circumstances, those courses "continued to

be whatever they were." *Id.*

It does not appear that the School District offered training regarding course designation. *See* Doc. #185-14 at 53–54. Bramuchi testified that it is "a district decision to determine the weights of courses. It's not a course or a training that you go to. It's based on the decision of the principals and the teachers who teach the courses that get together that create the guides that say, these are how we are teaching these courses." *Id.*

To assist with school administration and specifically grade calculation, the School District contracts with the company Central Access to maintain the SAM Spectra managing system. Doc. #232-12 at 10–12. "SAM Spectra is a managing system that [assists] Mississippi school districts to manage enrollment, attendance, grading, scheduling, discipline, special education, state reporting, calendars, dashboards, a parent portal, a student portal, iOS apps, etc." Doc. #185-4 at ¶ 5. With respect to grading, Central Access receives information from a school district on "how … GPA [Grade Point Average] and QPA [Quality Point Average] should be calculated" and then Central Access "create[s] the grade scripts for them." Doc. #232-12 at 17. "QPA reflects a student's weighted grade point average on a 6 point scale taking into account any advanced placement credit …." Doc. #185-4 at ¶ 6. "GPA reflects only grades on a 4 point scale …." *Id.*

Course information in SAM Spectra carries over from year to year such that if a course was listed as Accelerated one year and Regular in another, the change would have to be made manually. Doc. #232-12 at 53. In this respect, while the grade scripts in SAM Spectra are produced automatically, a person with access to SAM Spectra may manually manipulate the quality points on a student's transcript. *Id.* at 30. In the School District, administrators, principals, and counselors had access to grade scripts in the SAM Spectra system. Doc. #231-6 at 49.

SAM Spectra also assists the School District with meeting state reporting requirements

5

through the Mississippi Student Information System ("MSIS"). *See* Doc. #185-19 at 144. The data for MSIS is "pull[ed] from SAMS." *Id.* Additionally, the School District maintains course detail reports listing the courses offered at each of the schools in the School District. *See* Docs. #230-11, #230-12, #230-13. The course detail reports are pulled from the information in the Central Access system. Doc. #232-12 at 76–77.

The School Board delegated responsibility for ensuring the accuracy of SAM/MSIS systems to Jacqueline Thigpen, the School District superintendent. Doc. #231-2 at 90; Doc. #231 at 116. Thigpen, in turn, delegated this authority to the MSIS/SAM coordinator and to an assistant superintendent.[11] Doc. #231 at 117; Doc. #231-2 at 91.[12] However, the superintendent cannot change the curriculum guide without School Board approval. Doc. #231-3 at 111.

While the curriculum guides changed from year to year, the general standards for assigning rank points did not change. Under such standards, the amount of quality points awarded for a class depended on two factors—whether the class was designated Advanced, Accelerated, or Regular, and the student's grade in the class. *See* Doc. #185-8. Advanced classes are graded on a six-point scale where an A is worth six points, a B is worth five points, a C is worth four points, a D is worth three points, and an F is worth zero points. *Id.* Accelerated classes are graded on a five-point scale where an A is worth five points, a B is worth four points, a C is worth three points, a D is worth two points, and an F is worth zero points. *Id.* Regular classes are graded on a four-point scale where an A is worth four points, a B is worth three points, a C is worth two points, a D is worth one point, and an F is worth zero points. *Id.* Classes not designated as Advanced or Accelerated in the relevant curriculum guide were to be deemed Regular courses. *Id.*

---

[11] Richard Boggs testified that he believed principals were responsible for ensuring the accuracy of the data. Doc. #231-1 at 148. This seemed to be based on the belief that "[t]he superintendent would have held them accountable for that." *Id.*

[12] According to Chresteen Seals, Thigpen told the School Board that responsibility for the MSIS/SAM database was delegated to Bramuchi. Doc. #231-2 at 91. According to Bramuchi, this responsibility was delegated to Angela Harris, the other assistant superintendent. Doc. #185-14 at 37.

**B. Course Offerings, and International Baccalaureate and STAR Programs**

As noted above, before this Court ordered consolidation, the School District operated two middle schools—D.M. Smith, a single-race African American school, and Margaret Green, a school with approximately half white enrollment. The School District also operated two high schools—East Side, a single-race African American school, and Cleveland High, a school with approximately half white enrollment.

The course offerings at East Side and Cleveland High were, for the most part, the same. *Compare* Doc. #230-12 (East Side course detail reports) *with* Doc. #230-11 (Cleveland High course detail reports). However, the School District operated an International Baccalaureate Middle Years Program for 6th to 10th graders at D.M. Smith and East Side. *See* Doc. #185-10 at PageID 3494. East Side also offered an International Baccalaureate Diploma Program for 11th and 12th graders. *Id*. The courses in these programs offered academically challenging work for the enrolled students. *See* Doc. #185-10 at PageID 3458; Doc. #233 at 13. The School District ended the IB Program for the 2016-2017 academic year because it was cheaper to offer AP courses instead of IB courses. Doc. #230-5 at 37–38.

Margaret Green maintained an academically challenging track known as the STAR Program. Doc. #233-4 at 89–90. Unlike the IB Middle Years Program, which was open to all, students had to be selected for the STAR Program. *See* Doc. #241-12; Doc. #233-4 at 90. Students selected for the STAR Program received a letter to determine whether they would enroll in the program at Margaret Green. Doc. #185-16 at 89–90. Students enrolled in the STAR Program were, among other things, offered the opportunity to take "rigorous" "Saxon" math classes at Cleveland High. *Id*. at 89–92. Only students in the STAR Program were eligible to take the Saxon courses. Doc. #185-16 at 92.

The Saxon courses were Saxon Advanced Algebra, "Saxon Adv Algebra,"[13] Saxon Algebra II, and Saxon Geometry. Doc. #230-11 at PageID 6906. These Saxon courses were not listed by the Department of Education as approved courses. *See* Docs. #230-16, #230-17, #230-18, #230-19. But in the relevant course detail reports, they are identified by a state-approved six digit-number followed by the letter "S." *See* Doc. #230-11 at PageID 6906. Saxon Adv Algebra used the six-digit code for trigonometry. *See id.*; Doc. #230-16 at PageID 6966. Saxon Advanced Algebra used the six-digit code for "Algebra – Advanced." *See* Doc. #230-11 at PageID 6906; Doc. #230-16 at PageID 6965. Saxon Algebra II used the six-digit code for "Algebra II." Doc. #230-11 at PageID 6906; Doc. #230-16 at PageID 6965. And Saxon Geometry used the six-digit code for "Geometry." Doc. #230-11 at PageID 6906; Doc. #230-16 at PageID 6966.

According to Bramuchi, the Department of Education assigns each approved course a specific course code and requires that those courses include a specific curriculum. Doc. #185-14 at 50–52. However, a school district maintains discretion to "add[] to" the curriculum and designate a class as Accelerated or Advanced. *Id.* The Saxon math courses taught at Cleveland High followed the relevant state curriculum but "with more rigor and depth." *Id.* at 52.

For the 2008-2009 curriculum guide, Saxon Algebra I and Saxon Algebra II were listed as Accelerated courses. Doc. #233-1 at PageID 7211. Saxon Algebra I is listed in the 2012-2013 and 2013-2014 curriculum guides but not as an Accelerated or Advanced course. *See* Doc. #185-10 at PageID 3454, 3465, 3491, 3501. The course description states, "The Saxon Algebra I course includes standard topics of Algebra I, an introduction to Unified Geometry, and their practical application and usefulness." *Id.* at PageID 3465, 3501.

---

[13] Saxon Advanced Algebra and Saxon Adv Algebra are two separate courses with separate course codes. Doc. #230-11 at PageID 6906.

According to Randy Grierson, the former principal at East Side, students at East Side did not travel to Cleveland High to take the Saxon math courses. Doc. #230-5 at 63–65. But students at Cleveland High could travel to East Side for IB courses. Doc. #185-19 at 136–37. Grierson did not know about the Saxon courses when he was principal at East Side. *Id.* at 67–68. During his tenure as East Side's principal, Human A&P was the only course for which East Side students traveled to Cleveland High. *Id.* at 65. This was because Grierson did not want the kids to travel unless that was a course "they needed and wanted." *Id.* at 65–66.

### C.  James' Academic Career Before Consolidation

As a student at D.M. Smith, James participated in the School District's Diploma and Middle Years IB programs. Doc. #233 at 13–15. James elected to attend D.M. Smith because of the IB Program "and how the weights were being afforded for those classes." Doc. #230-6 at 11. It does not appear that she was selected for the STAR Program. *Id.* Through her junior year, James took the following credit courses:

- 2012-2013 Academic Year (7th Grade):  7-Pre Algebra
- 2013-2014 Academic Year (8th Grade): Spanish I; Information & Communication Tech II; 8-Algebra I
- 2014-2015 Academic Year (9th Grade): VT-Science, Tech, Eng & Math App; United States History; Learn Strat Soc Stud; Learn Strat-Science; FLD Exper.-SS; English I; Choral Music; CCSS Geometry; Biology I
- 2015-2016 Academic Year (10th Grade): World History; Spanish II; Physical Education; PE; Mississippi Studies; Health; Geography; English II; Chemistry; Algebra II; ACT Prep
- 2016-2017 Academic Year (11th Grade):  VT-Entrepreneurship; Survey of African American Writing; Human A&P; English III; Creative Writing; Basketball; Basketball; AP Biology; Algebra III; AP U.S. History

Doc. #185-12. James earned an A in all but five of these classes.[14] *Id.*

As of May 25, 2017, at the close of her junior year at East Side, James' grade script

---

[14] James earned a B in 8-Algebra I, Learn Strat Soc Stud, Learn Strat-Science, Biology I, and Algebra III. Doc. #185-12.

reflected a QPA of 4.23. Doc. #59-2 at PageID 611.[15] Of relevance here, Creative Writing (taken in 2016-2017), Algebra II (taken in 2015-2016), and Spanish II (taken in 2015-2016) were listed as Accelerated courses. *Id.* Human A&P, A.P.–U.S. History, Algebra III, and AP Biology (all taken in 2016-2017) were listed as Advanced. *Id.* None of these courses were listed as Accelerated or Advanced in the controlling[16] curriculum guides. *See* Doc. #185-10 at PageID 3454, 3475 (2012-2013 curriculum guide); *id.* at PageID 3491, 3511 (2013-2014 curriculum guide); Doc. #185-11 at PageID 3567, 3591 (2015-2016 curriculum guide); *id.* at PageID 3608 (2016-2017 curriculum guide).

Also in this grade script, Chemistry, taken by James in the 2015-2016 academic year, was designated as Regular, in contravention of its Accelerated designation in the 2015-2016 curriculum guide. Doc. #185-11 at PageID 3567. A.P. U.S. History, Algebra III, and A.P. Biology (all of which James took in the 2016-2017 academic year), were designated as Advanced, consistent with their designations in the 2016-2017 curriculum guide. Doc. #59-2 at PageID 611; Doc. #185-11 at PageID 3608.

### D.   Consolidation and Shepard Lawsuit

On April 1, 2014, the Fifth Circuit Court of Appeals reversed and remanded *Cowan* for further explanation of Judge Davidson's adoption of the freedom of choice plan. *Cowan v. Cleveland Sch. Dist.*, 748 F.3d 233, 240 (5th Cir. 2014). After Judge Davidson recused himself, the *Cowan* litigation was assigned to the undersigned district judge.[17]

On remand, the parties submitted competing desegregation plans. *See Cowan v. Bolivar*

---

[15] This document was listed as an exhibit in James' response to the motions for summary judgment but was not attached to the motion. *See* Doc. #230. The Court cites to a copy of the document appearing earlier on the docket.

[16] In the 2008-2009 curriculum guide, "Foreign Language I & II," Creative Writing, and Algebra II were listed as Accelerated. Doc. #233-1 at PageID 7211. Human A&P was listed as Advanced. *Id.* But none of the courses were so designated for the years James took the classes.

[17] *Cowan*, No. 2:65-cv-31 at Doc. #100.

*Cnty. Bd. of Educ.*, 186 F. Supp. 3d 564, 575 (N.D. Miss. 2016). The United States submitted a plan consolidating the School District's middle schools and consolidating its high schools. *Id.* at 611. The School District, citing fears of white student departure (also known as "white flight") and a desire for "choice," opposed consolidation. *Id.* at 618.

Ultimately, this Court, on May 13, 2016, adopted the United States' plan and ordered the consolidation of the School District's schools. *Id.* at 621. The School District initially appealed the decision but withdrew its appeal and agreed to a slightly modified consolidation plan, which this Court approved on March 13, 2017. *Cowan v. Bolivar Cnty. Bd. of Educ.*, No. 2:65-CV-31, 2017 WL 988411, at *2 (N.D. Miss. Mar. 13, 2017).

That spring, the School District announced Jasmine Shepard (African American) and H.B. (white) as co-valedictorians of Cleveland High's final graduating class. Doc. #233-2. On May 30, 2016, Sherry Shepard, Jasmine's mother, wrote Thigpen complaining that "District officials have failed to follow policies relative to Class Weights and Final Senior Ranking, Grading, and Counseling Services." Doc. #231-5.

On June 27, 2017, Sherry, on Jasmine's behalf, filed suit against the School District, Thigpen, and Steven Craddock (Cleveland High's principal).[18] The thrust of Shepard's lawsuit was that H.B., in violation of the controlling curriculum guides, received Accelerated credit for a Human A&P course and Advanced credit for an online Physics course, both taken during the 2014-2015 school year.[19] *Shepard v. Cleveland Sch. Dist.*, No. 4:17-CV-91, 2019 WL 4784612, at *6 (N.D. Miss. Sept. 30, 2019).

---

[18] *Shepard v. Cleveland Sch. Dist.*, No. 4:17-cv-91, at Doc. #1 (N.D. Miss. June 27, 2017).

[19] On September 30, 2019, this Court granted the *Shepard* defendants' motions for summary judgment on all claims. *Shepard v. Cleveland Sch. Dist.*, No. 4:17-cv-91, 2019 WL 4784612 (N.D. Miss. Sept. 30, 2019). The Fifth Circuit affirmed this decision on September 25, 2020. *Shepard v. Cleveland Sch. Dist.*, 822 F. App'x 312 (5th Cir. 2020).

### E.  2017-2018 Academic Year

When the high schools consolidated for the 2017-2018 academic year, Grierson was named the principal of the newly formed Cleveland Central High School.   Doc. #185-5 at ¶ 2.   The school had four guidance counselors:   LaShundreya Townsend, who is African American; Marion Story, who is African American; Nakita Goins, who is African American; and Alyson Jones, who is white.   Doc. #185-14 at 43–44; *see* Doc. #185-7 at PageID 3427.   The School Board was comprised of George Evans, Todd Fuller, Richard Boggs, Chresteen Seals, and Tonya Short.   Doc. #193-7 at PageID 3393.   Evans was the President, Fuller was the Vice President, Boggs was the Secretary, Seals was the Chaplain, and Short was the Parliamentarian.   *Id*.   Thigpen was the School District superintendent.   Doc. #185-4 at ¶ 2.   Bramuchi, who is white,[20] and Angela Harris, who is black,[21] were assistant superintendents.   Doc. #185-3 at ¶ 3; Doc. #185-7 at PageID 3393.

During the 2017-2018 academic year, James took the following courses:   U.S. Government, Physics, Economics, AP Calculus, and AP Eng Language & Composition.   Doc. #185-12.   She earned an A in all these classes except for   the B she earned in AP Calculus.   *Id.*

### F.   Determining Course Ranks

For the 2017-2018 academic year, the curriculum guide provided the following procedure for determining class honors:

> Courses are designated as Regular (4 points), Accelerated (5 points), and Advanced (6 points). Courses are marked in the Sam Spectra student package based on the rank points assigned to courses in the current year curriculum guide. Once final grades are entered and posted, the students' GPA is calculated by the student package for college reporting. Colleges do not recognize the 6 point scale.

> The cumulative weighted QPA will be used to determine the Valedictorian and Salutatorian. The cumulative weighted QPA includes the rank points of all courses for which a Carnegie unit is awarded.

---

[20] Doc. #185-14 at 137.

[21] *Id.* at 37.

….

Graduating seniors who earn class honors will be recognized in the following manner:

**Valedictorian** - The student with the highest Grade Point Average. …

**Salutatorian** - The student with the second highest Grade Point Average.

Doc. #185-11 at PageID 3641. While the valedictorian and salutatorian awards reference GPA rather than QPA, the parties do not dispute that, as specifically stated in the guide, the award is to be determined by reference to QPA.

In early May 2018, Denise Mullins, the School District's SAMS, MSIS, and Educational Technology Specialist, was assigned the task of "closing out the 2017-2018 school year's grade scripts to make sure all data including course weights, course grades, quality points, and grade points were true and correct ahead of the May 2018 graduation." Doc. #185-1 at ¶ 2–3. This task was previously handled by Cynthia Kemp, who had recently become ill. Doc. #185-4 at ¶ 3.

Due to the recent consolidation, Mullins, who is white,[22] "paid close attention … to ensure … grade scripts were correct according to the Cleveland School District handbook policy." Doc. #185-1 at ¶ 4. Upon review, Mullins noted "discrepancies in a number of students' grade scripts." *Id*. at ¶ 5.

On May 1, 2018, Mullins ran a grade script for James. Doc. #231-8. The script showed a cumulative GPA of 3.82. *Id*. The script listed Physics, Human A&P, Creative Writing, Algebra II, 7-Pre-Algebra, 8-Algebra, and Spanish II, as Regular classes. *Id*.

The next day, Mullins e-mailed Central Access, copying Bramuchi and Thigpen, regarding the discrepancies. Doc. #185-2. The e-mail states:

I need someone to look at the attached Cumulative weighted QPA's for me. The highlighted classes are in question.

---

[22] Doc. #185-14 at 137.

School year 14/15 Saxon Alg. II should show accelerated instead of regular.

For student [T.J.]
School year 13/14 Saxon Alg 8 -. The student made a C, it gave him 2 points and it should have given him 3 points.
Saxon Alg II-Accelerated[.] The student made a C. it gave him 2 points, it should have given him 3 points.

[W.M] 2015 Saxon Algebra II – this class should be Accelerated.
[M.W.] 2015 Saxon Algebra II – this class should be Accelerated
[K.B.] 2018 Physics shows regular on grade script but should be Accelerated
Olecia James 2018 Physics shows regular on grade script but should be Accelerated.

Human A&P shows Regular on Some students and AP on other students
2017 Olecia James Human A&P shows Reg/Reg
2017 [W.M.] Reg/Advanced

We cleaned up the course types with Joann several months back. We missed a few that I am correcting today but it appears that the calculations aren't calculating right. It doesn't show consistency across the board from one student with the same class to another student. Example-2017 Human A&P. Can you tell me if scripts need to be re-run?

*Id*.

Bramuchi and Mullins discussed the discrepancies in the grade scripts and "learned the discrepancies were too big of an issue for two people to fix in such a small amount of time." Doc. #185-1 at ¶ 6. Bramuchi spoke with Thigpen, who then requested a May 4, 2018, meeting with all counselors from Cleveland Central High School. *Id*. at ¶ 6; Doc. #185-3 at ¶ 4.

On May 4, 2018, all counselors from Cleveland Central, Bramuchi, and Thigpen reviewed the grade scripts for each senior "for accuracy or to highlight any discrepancies of any kind including inconsistencies in course weights, credit hours earned, or for any missing course." Doc. #185-3 at ¶ 5. The counselors attempted to change the scripts "to be consistent with the grading policy located in the Cleveland School District handbook for the appropriate years." Doc. 185-4

at ¶ 7. Each counselor signed the student's grade script they reviewed.[23] *Id*. at ¶ 7. While the counselors did not utilize a key, when a counselor "saw a course that needed to be corrected, they would talk about it, discuss it between themselves" and then Bramuchi would decide on the correction. Doc. #231-6 at 87.

According to Thigpen, the counselors did not discuss the proper points to be awarded for Saxon Algebra and Saxon Geometry. Doc. #185-15 at ¶ 2. But Thigpen believes these courses should have been considered Accelerated courses based on their content and were treated as such by the counselors. *Id*. When the meeting concluded, Thigpen directed Mullins to continue "updating the grade scripts to bring them in line with the Cleveland School District handbook policies." Doc. #185-4 at ¶ 7.

Sometime in early May 2018,[24] the School District held a senior athletic banquet. Doc. #185-22 at 101–02. At the banquet, M.W. received the STAR Athlete Award, an honor for the student athlete with the highest GPA. *Id*. The award came with a $1,500 scholarship. *Id*. The criteria for the STAR Athlete Award was "something the coaches came up with." Doc. #185-19 at 86.

On May 4, 2018, Obbie James (James' father) and Yvonne Herron (James' grandmother) contacted Thigpen to complain about the STAR Athlete award. Doc. #185-4 at ¶ 6. Thigpen told James' family that she would investigate the issue. *Id*.

On May 8, 2018, the School District, at Herron's request, provided Herron a copy of James' grade script, as modified during the May 4, 2018, meeting. Doc. #185-4 at ¶ 8. The script reflects a QPA of 4.29. Doc. #232. On the script, Physics, Chemistry, and Creative Writing were

---

[23] It is unclear which counselor reviewed James' transcript on May 4.

[24] According to James, the banquet was held on May 16. Doc. #185-22 at 102. Thigpen's affidavit suggests the banquet was held before May 4. Doc. #185-4 at ¶ 6. The precise date is immaterial to resolution of the summary judgment motions.

listed as Accelerated courses. *Id*. Human A&P was listed as Advanced. *Id*. 7-Pre Algebra, 8-Algebra I, Algebra II, and Spanish II were listed as Regular courses. *Id*.

Two days later, the School District distributed to all seniors updated grade scripts. Doc. #185-4 at ¶ 9. The School District asked that the students "review their grade scripts, QPAs, and GPAs and inform the appropriate counselor of any issues they may have found on their updated grade script." *Id*.

On or about May 11, 2018, James and her family attempted to speak to Grierson about the class ranking situation. Doc. #230-5 at 25; Doc. #185-5 at ¶ 5. Grierson directed them to speak to Thigpen. Doc. #185-5 at ¶ 5. Grierson told James' family that he did not have access to grade scripts*. Id*. That day, James and her family brought to Thigpen's attention certain alleged discrepancies in her grade script. Doc. #185-4 at 4. Based on this conversation, Thigpen instructed Mullins "to request that SAM Spectra Central Access adjust the course weights and return [James'] original course weights to her grade script." *Id*. The same day, Mullins, at Thigpen's request, requested through SAM Spectra's central access to designate as Accelerated for all students (1) 7-Pre Algebra offered in 2012-2013; (2) 8-Algebra I offered in 2013-2014; (3) Algebra II offered in 2015-2016; and (4) Spanish II offered in 2015-2016. Doc. #185-1 at ¶ 8.

On May 14, 2018, Jones e-mailed Mullins and Bramuchi, stating:

> Pre Algebra and Algebra I at DM Smith was not an accelerated class. The students chosen for STAR program attended MGJH and had Saxon Pre Algebra and Saxon Algebra I. Saxon and Regular are two different classes. If the students weren't chosen for STAR the classes were regular curriculum.

Doc. #241-13 at PageID 7545. Jones forwarded the e-mail to Thigpen later that day. *Id*. She sent a second e-mail stating, "As well as 7th grade Pre Algebra. It is a regular class." *Id*. at PageID 7544.

On May 14, 2018, James and her family appeared before the School Board and expressed concerns about the assignment of points on James' grade script. Doc. #185-4 at ¶ 11; Doc. #185-

3 at ¶ 7.   At the meeting, James was given a new grade script.   Doc. #185-4 at ¶ 11; Doc. #232-3.   This script shows a weighted QPA of 4.41.   Doc. #232-3.   Physics, Chemistry, Creative Writing, Algebra II, 7-Pre-Algebra, 8-Algebra, and Spanish II were listed as Accelerated courses. *Id*.   Human A&P was listed as Advanced.   *Id*.   According to Thigpen, the School Board "instructed" her to investigate the issue of assignment of rank points.   Doc. #185-4 at ¶ 11. However, this instruction does not appear in the School Board's minutes for the May 14 meeting. *See* Doc. #185-7.

As of May 16, 2018, " all issues regarding grades were resolved" as to the proper weight for every class except Spanish II and Creative Writing, which had been treated as Accelerated[25] at East Side but as Regular courses at Cleveland High.   Doc. #185-4 at ¶ 12.   According to Thigpen, she was unaware until May of 2018 that East Side treated these classes as Accelerated, and the teachers at East Side did not believe that "these courses met any advanced placement criteria for degree of difficulty."   *Id*.   Accordingly, after consultation with counsel, Thigpen decided that "all seniors' grades would be changed in accordance with the grading policy of the Cleveland School District handbook policy, regardless of what high school they previously attended."   *Id*.

On May 16, 2018, Mullins, at Thigpen's direction, e-mailed Central Access requesting that the following courses be designated as Regular:   (1) Algebra II offered in 2015-2016;[26] (2) Spanish II offered in 2014-2015 and 2015-2016; (3) and Creative Writing offered from 2012-2013

---

[25] Thigpen's affidavit refers to "advanced placement" credit for these courses.   Doc. #185-4 at ¶ 12.   But as noted above, the classes were treated as accelerated at East Side.

[26] In her affidavit, Thigpen did not specifically list Algebra II as one of the courses which had been treated as Accelerated at East Side but should have been listed as Regular.   It was.   There is no question that Algebra II was not listed as an Accelerated course in any of the relevant curriculum guides.   Furthermore, Mullins' affidavit represents that Thigpen directed her to include Algebra II in her May 16 e-mail.   Doc. #185-1 at ¶ 9; Doc. #185-9. Grierson, East Side's principal, testified that Algebra II should not have been treated as an Accelerated course because it was just a "general" course.   Doc. #185-19 at 62, 153.   Lucille Holmes, a former employee of the School District, testified that Algebra II should have been treated as Accelerated.   Doc. #185-23 at 33–34.   However, this testimony was not based on the content of the course but rather on a mistaken belief that the Accelerated designation was found in the curriculum guide or school handbook.   *Id*.

through 2016-2017.   Doc. #185-9.

The same day, Glena Haynes Weeks, the mother of M.W., a white student at Cleveland Central, posted on Facebook regarding the class ranking process.   Doc. #232-6 at PageID 7138. In her post, Weeks stated that she and her husband "met with the Principle [sic] and Vice Principle [sic] before Christmas to check on [M.W.'s] standing and at that time, she was almost tied for 1st place."   *Id*.   Weeks also complained that "the mother of the young lady that is supposed to be announced as Val just happens to work at the school" and that Weeks had "asked on several occasions for [M.W.'s] standing and … cannot get an explanation."   *Id*.   In a response to a comment, Weeks stated that the student handbook was "not being followed!"   *Id*. at PageID 7139.

On the morning of May 17, 2018, Jones sent an e-mail to Grierson and Craddock, copying Thigpen, Bramuchi, Harris, and counsel for the School District.   Doc. #241-12.   The e-mail states:

> This is only for documentation purposes for the senior class of 2017-18. This is not meant in any way to be disrespectful or question authority.
>
> • The counselors met on Friday, May 4th and corrected all the weights, as asked and these corrections were made in SAMs. On Thursday, May 10th all seniors were given a copy of their Cumulative Weighted QPA along with a grade script print out. Between Monday, May 14 and Tuesday, May 15 rankings and weighted cumulative QPAs changed significantly**.**
>
> • There is no criteria or policy for the selection process of students into the MYP program that was at D. M. Smith Middle School and continued through 10th grade at East Side High School. There is no documentation that any of the classes offered in this program would be weighted. There is no curriculum for these accelerated math classes, but their course codes are identical to the Pre-Algebra and Algebra classes that receive a Regular weight.
>
> • DM Smith students of the senior class of 2018 are receiving weighted grades for Pre- Algebra and Algebra I due to being enrolled in the MYP program. That means every student previous to this year, enrolled in the MYP program should have received the same weight for Pre- Algebra and/ or Algebra. Students enrolled in the MYP program after this year's seniors would also have an Accelerated weight for Pre-Algebra and/or Algebra. As of May 16, this weight had only been given to the senior class of 2018.

• MYP math classes have never been listed in the curriculum guide as a weighted class and it cannot be proven that we gave all students this weight previous to this year.

• All students taking the same class with the same course code will receive the same weight regardless of what school they attended.

• Certain students who took Algebra II and Spanish II by their 10th grade year received an Accelerated weight for those classes.

• Since students thought they were receiving Accelerated weight for certain classes at the end of 2017 we are honoring those weights. Therefore, the Saxon Algebra II classes and the Saxon Geometry classes will receive an Advanced weight. This change has been made only for the MYP /East Side students.

• Dual credit classes are weighted. There is no policy or any documentation of these classes carrying a weight.

*Id.*

On May 17, 2018, Mullins ran another grade script for James. Doc. #185-12. This script reflects a QPA of 4.33. *Id.* On this script, Physics, 7-Pre-Algebra, 8-Algebra, and Chemistry were listed as Accelerated courses. *Id.* Human A&P, AP Eng Language & Composition, AP Calculus, AP U.S. History, Algebra III, and A.P. Biology were listed as Advanced. *Id.* Creative Writing, Algebra II, and Spanish II were listed as Regular courses. *Id.*

The same day, Mullins ran a grade script for W.M. Doc. #185-13. This script reflects a QPA of 4.34. *Id.* W.M. received Accelerated credit for (1) Saxon 7 Pre Algebra, taken during the 2012-2013 academic year; (2) 8 Saxon Algebra, taken in the 2013-2014 academic year; (3) Saxon Algebra II, taken in the 2014-2015 academic year; (4) Saxon Geometry, taken in the 2015-2016 academic year; and (5) Chemistry, taken in the 2015-2016 academic year. *Id.* W.M. received Advanced credit for (1) Human A & P, taken in the 2016-2017 academic year; (2) Algebra III, taken in the 2016-2017 academic year; (3) Calculus, taken in the 2017-2018 academic year; and (4) AP Biology, taken in the 2017-2018 academic year. *Id.*

Mullins also ran a grade script for M.W. which reflected a QPA of 4.33. Doc. #185-21.

Like W.M., M.W. received Accelerated credit for the various Saxon courses and Chemistry. *Id.* M.W. also received Advanced credit for Algebra III, Calculus, AP English Language & Composition, and AP Biology. *Id.*

Mullins ran a grade script for K.B. showing a QPA of 4.44. Doc. #230-9. K.B. received Accelerated credit for (1) 7-Pre Algebra, taken in the 2012-2013 academic year; (2) 8-Algebra I, taken in the 2013-2014 academic year; (3) Chemistry, taken in the 2015-2016 academic year; and (4) Physics, taken in the 2017-2018 academic year. *Id.* She received Advanced credit for (1) Human A & P, taken in the 2016-2017 academic year; (2) AP Biology, taken in the 2016-2017 academic year; (3) Algebra III, taken in the 2016-2017 academic year; (4) A.P.–U.S. History, taken in the 2016-2017 academic year; (5) AP-Calculus, taken in the 2017-2018 academic year; and (6) AP English Language & Composition, taken in the 2017-2018 academic year. *Id.* K.B. received Regular credits for Spanish II, Creative Writing, and Algebra II. *Id.*

In the final class rankings, K.B., who is black,[27] was named valedictorian, with a Cumulative Weighted QPA of 4.44. Doc. #241-11. W.M. was named salutatorian, with a cumulative weighted QPA of 4.34. *Id.* James was tied with M.W. for third with a QPA of 4.33.[28] *Id.* A table comparing the courses taken by W.M., M.W., and James and the designations placed on such courses is attached to this opinion as Appendix A.

### III
### Procedural History

On April 26, 2019, James filed a complaint against the Cleveland School District, Bramuchi, Grierson, Thigpen, Evans, Boggs, Fuller, Seals, and Short. Doc. #1. The individual defendants are all sued in their individual and official capacities. *Id.* The complaint asserts two

---

[27] *See* Doc. #232-2 at 134.

[28] A third student, J.W., also had a QPA of 4.33. Doc. #230-10. The specifics of her grade script are not challenged by James and ultimately are irrelevant to the disposition of this case.

causes of action: (1) an equal protection claim based on the allegation that the defendants treated "James less favorably than … similarly situated white students;" and (2) a due process claim based on the allegation that the defendants gave "W.M. more points for courses than allowed by the school district's policies as outlined in the Student Handbook and Curriculum Guide." *Id*. at 9–10.

After the close of discovery, Thigpen, Grierson, Bramuchi, and the School District filed motions for summary judgment on the claims brought against them. Docs. #185 (Thigpen motion), #187 (Grierson motion), #188 (Bramuchi motion); #191 (School District motion). Evans, Boggs, Fuller, Seals, and Short (collectively, "Board Defendants"), filed a joint motion for summary judgment. Doc. #193. James did not respond to the Board Defendants' motion. The other motions, however, are fully briefed.

## IV
## 42 U.S.C. § 1983 and Qualified Immunity

42 U.S.C. § 1983 provides for a civil action against any person who, under color of state law, violates a plaintiff's constitutional rights. "To state a claim under Section 1983, a plaintiff must assert facts to support that a person acting under color of state law denied the plaintiff a right under the Constitution or federal law." *Stem v. Gomez*, 813 F.3d 205, 210 (5th Cir. 2016).

For a governmental entity, such as a school district, to be held liable under § 1983, a plaintiff must show "1) a policymaker; 2) an official policy; 3) and a violation of constitutional rights whose 'moving force' is the policy or custom." *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003). "When a government official is sued under Section 1983, the plaintiff must [show] that the official was either personally involved in the deprivation or that his wrongful actions were causally connected to it." *Stem*, 813 F.3d at 210 (internal quotation marks omitted). If a plaintiff seeks to impose liability based on a defendant's supervisory actions (rather than direct involvement with the constitutional violation), the plaintiff must show that the supervisor

"implement[ed] unconstitutional policies that causally result[ed] in the constitutional injury." *Romero v. Brown*, 937 F.3d 514, 523 (5th Cir. 2019). Such policies must have been enacted with deliberate indifference to constitutional rights. *Id.*

Even when a § 1983 cause of action exists, "[t]he doctrine of qualified immunity protects [individual] government officials from civil damages liability when their actions could reasonably have been believed to be legal." *McLin v. Ard*, 866 F.3d 682, 688–89 (5th Cir. 2017). When properly raised, "[q]ualified immunity shields government officials from civil liability in their individual capacity so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Cunningham v. Castloo*, 983 F.3d 185, 190 (5th Cir. 2020) (internal quotation marks omitted). Thus, a qualified immunity defense raises two questions which may be resolved in any order: "(1) was a statutory or constitutional right violated on the facts alleged; and (2) did the defendant's actions violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Tucker v. City of Shreveport*, 998 F.3d 165, 172 (5th Cir. 2021).

There is no dispute that the individual defendants have properly raised qualified immunity in this case.[29] Accordingly, to survive summary judgment on her claims against the individual defendants, James must establish, for each individual defendant, a genuine issue of material fact as to a constitutional violation and that the defendant's conduct violated clearly established law. *Id.* Because, as discussed below, this Court finds that James has failed to raise a genuine issue of material fact with respect to her constitutional claims, the Court need not reach the second prong of the qualified immunity analysis or decide whether the other elements for municipal liability exist.

---

[29] A defendant properly raises a qualified immunity defense by "plead[ing] his good faith and establish[ing] that he was acting within the scope of his discretionary authority." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). James does not dispute that the defendants have properly invoked the defense of qualified immunity.

**V**

**Claims Against the Board Defendants**

In seeking summary judgment, the Board Defendants argue that James cannot establish a constitutional violation and that even if she could, they cannot be held liable for decisions made by the School Board as a whole.   Doc. #194 at 12–15.   They therefore argue that because there is no evidence that any "individual board member made any unilateral decisions regarding Plaintiff's complaints about her grades," her claims must fail.   *Id.* at 13.   James did not respond to the Board Defendants' motion.

For the reasons below, this Court concludes that James has failed to show a constitutional violation which would support liability against any of the defendants.   However, even if she could show a violation, summary judgment for the Board Defendants would still be warranted but not quite for the reasons argued.

It is true that courts in Mississippi have held that individual board members cannot be held individually liable under § 1983.   *See Owens v. City of Flowood*, No. 3:16-cv-451, 2017 WL 368725, at *2 (S.D. Miss. Jan. 23, 2017); *Turner v. Tunica Cnty.*, No. 2:04-cv-213, 2005 WL 3159236, at *3 (N.D. Miss. Nov. 28, 2005); *George v. Shelton*, No. 1:98-cv-148, 1999 WL 33537122, at *2 (N.D. Miss. Mar. 18, 1999).   But these decisions were all based on the reasoning that the ultimate decision was made by the board and not the individual members.   And in 2018, the Fifth Circuit, in *Sims v. City of Madisonville*, clarified that § 1983 liability may attach to non-decisionmakers but only when the defendant's conduct is a "but-for" cause of a constitutional violation.   894 F.3d 632, 639 (5th. Cir. 2018).

In the wake of *Sims*, courts have held that an individual board member may be individually liable when his individual conduct is a but-for cause of a constitutional violation.   *Williams v. Canton Pub. Sch. Dist.*, No. 3:19-CV-927, 2020 WL 2477671, at *2 (S.D. Miss. May 13, 2020).   In that event, a plaintiff must "demonstrate what *each* defendant did to violate the asserted

constitutional right." *Pelichet v. Hertel*, No. 2:18-cv-11385, 2021 WL 1175287, at *7 (E.D. Mich. Mar. 29, 2021).

By failing to respond to the Board Defendants' summary judgment motion, James has made absolutely no attempt to identify an individual action taken by any of the Board Defendants which would support individual § 1983 liability. And the Court sees no such action in the record. Accordingly, her claims brought against the Board Defendants fail.

## VI
## Due Process Claims

The Fourteenth Amendment provides that a state may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The protections afforded by the due process clause take two forms, procedural and substantive. "When the fault lies in a denial of fundamental procedural fairness, the question is one of procedural due process." *Jauch v. Choctaw Cnty.*, 874 F.3d 425, 430 (5th Cir. 2017) (internal quotation marks omitted). "Substantive due process bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Marco Outdoor Advert., Inc. v. Reg'l Transit Auth.*, 489 F.3d 669, 672 n.3 (5th Cir. 2007) (internal quotation marks omitted). Both types of claims require a deprivation of a life, liberty, or property interest. *See Cripps v. La. Dep't of Agric. & Forestry*, 819 F.3d 221, 232 (5th Cir. 2016) (substantive due process); *Morris v. Livingston*, 739 F.3d 740, 749–50 (5th. Cir. 2014). James appears to assert both procedural and substantive due process claims against all the defendants.

### A. Procedural Due Process

A procedural due process claim requires two inquiries: "(1) whether there exists a liberty or property interest which has been interfered with by the State and (2) whether the procedures attendant upon that deprivation were constitutionally sufficient." *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 229 (5th Cir. 2020) (internal quotation marks omitted). The defendants

challenge only the first element of James' procedural due process claim.   Doc. #189 at 25; Doc. #194 at 14–15; Doc. #192 at 24–25; Doc. #190 at 26; Doc. #186 at 24–25.   James responds that pursuant to *Mississippi High School Activities Association v. R.T.*, 163 So.3d 274, 279–80 (Miss. 2015), she "had a protected property interest in the rules adopted by CSD to govern the award of rank points and the selection of salutatorian."[30]   Doc. #234 at 29–30.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."   *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (internal quotation marks omitted).   "Property interests are not created by the Constitution. Instead, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."   *Richardson*, 978 F.3d at 230 (cleaned up).   However, "[t]hough state law is the source of the right, the question of whether a property interest is created is answered by federal constitutional law."   *Stem*, 813 F.3d at 211.   Thus, the relevant question is not whether state law identifies a particular benefit as a property interest specifically but whether under *state law* there is a "legitimate claim of entitlement" which under *federal law* "rises to the level of a legitimate claim of entitlement protected by the Due Process Clause."   *Gonzales*, 545 U.S. at 757.   Entitlements may "aris[e] from statute, regulation, contract, or the like."   *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 735 (5th Cir. 2008).

When a state, such as Mississippi,[31] has provided an entitlement to a public education,[32] a

---

[30] It is unclear whether James asserts a protected property interest in the STAR Athlete award.   To the extent she does, the claim must fail because she has pointed to nothing which creates such an interest.

[31] *See* Miss. Code Ann. § 37-1-2; *Clinton v. Mun. Separate Sch. Dist. v. Byrd*, 477 So. 2d 237, 240 (Miss. 1985).

[32] It is unclear whether James seeks to assert a constitutional violation based on violations of state law.   To the extent she does, such claim must fail.   While it seems clear the School District acted inconsistently with state regulations by offering the unapproved Saxon courses and with its own policies by modifying grading policies without School Board approval, "[a] violation of state law standing alone does not establish a violation of federal constitutional law."   *Pierre v. Loc. Rule Pol'y Maker for First Cir. Ct. of Appeal*, 831 F. App'x 134, 135 (5th Cir. 2020) (citing *Giovanni v. Lynn*, 48 F.3d 908, 912–12 (5th Cir. 1995)).   And "courts have consistently held that where there is no property interest in the underlying decision, there is no protected property interest in the procedures which attend the decision."   *Miss. F.*

federal property interest exists in the promised education. *Goss v. Lopez*, 419 U.S. 565, 573–74 (1975). But this general right to a public education exists only "in the entire educational process." *Jeffrey v. Bd. of Trs. of Bells ISD*, 261 F. Supp. 2d 719, 726 (E.D. Tex. 2003). A student is deprived of this interest only when she "is excluded from the entire educational process." *Id*. That is not to say, however, that the only property interest in education is in the process as a whole. Rather, consistent with the law above, a student seeking to show a property interest right in an *aspect* of her public education (rather than the education as a whole) must "present a legitimate claim of entitlement based not on her subjective beliefs or perceived needs but on 'existing rules or understandings that stem from an independent source … that support claims of entitlement to those benefits.'" *Shepard v. Cleveland Sch. Dist.*, 822 F. App'x 312, 313 (5th Cir. 2020) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

James seeks to establish a property interest by pointing to the rules regarding class rank and points set forth in the applicable curriculum guides. Under Mississippi law, the "mere existence" of a handbook does not create an entitlement to any particular benefit. *Suddith v. Univ. of S. Miss.*, 977 So. 2d 1158, 1171 (Miss. Ct. App. 2007). "It matters what the handbook actually says." *Id*. at 1172. To this end, a student handbook may create a due process entitlement if there is "no discretion in the official and a reasonable expectation that the individual will receive the protected property interest." *Salcido v. Univ. of S. Miss.*, 557 F. App'x 289, 293 (5th Cir. 2014).

With respect to the rules regarding class ranks, the 2017-2018 curriculum guide (the academic year of James' graduation), provides that the title of salutatorian will be awarded to the "[t]he student with the second highest Grade Point Average." Doc. #185-11 at PageID 3641. While James takes issue with the method for calculating the Grade Point Averages and Quality Point Averages, there is no dispute that, as calculated, her Grade Point Average was not the second

---

*on Child. & Fams. v. Miss. Dep't of Hum. Servs.*, 850 F. Supp. 2d 644, 649 (S.D. Miss. 2012).

highest in her class. It follows, therefore, that there was no deprivation of this property interest. *See Shepard*, 822 F. App'x at 313 ("Cleveland High School's handbook explicitly contemplates the possibility of having multiple valedictorians. It is therefore beyond dispute that Shepard does not have a property interest in being named sole valedictorian.").

As for the alleged property interest in the assignment of rank points, it is necessary to distinguish two aspects of James' claims. Though James refers to the assignment of rank points broadly, she takes issue with two types of allegedly improper point assignments—decisions made with respect to *her* rank points and those made with respect to *others*. Because property interests may not be based on indirect benefits arising from actions against third parties, the assignment of rank points to others may not form the basis of a procedural due process claim. *See O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 787 (1980) ("[S]urely that impact, which is an indirect and incidental result of the Government's enforcement action, does not amount to a deprivation of any interest in life, liberty, or property."); *Simon v. Taylor*, 794 F. App'x 703, 709 & n.4 (10th Cir. 2019) (disciplinary proceedings against first-place horse did not give owner of second-place finisher a property interest in first place money).

With respect to the assignment of rank points to James, the Court assumes without deciding that the applicable curriculum guide[33] for each academic year creates a property interest in the rank points associated with listed courses. That is, the Court assumes that a student who took a course designated as Accelerated or Advanced in the relevant curriculum guide would have a property interest in receiving the corresponding Accelerated or Advanced rank points for that

---

[33] In some of her briefing, James refers to "course detail reports," which at various times listed Algebra II, Creative Writing, Spanish I, and Spanish II as Accelerated at East Side. Doc. #236 at 8. To the extent she intended to argue that these course detail reports created a property interest, such argument must fail. First, as noted above, the curriculum guides are deemed controlling in the School District. Furthermore, she has introduced no evidence that the course detail reports were ever provided to students to create an expectation of receiving specific ranking points. To the extent she relies on East Side's custom of awarding Accelerated credit for certain classes, this custom, which conflicts with the relevant curriculum guides, may not create a property interest. *See Wilkerson v. Univ. of N. Tex. ex rel. Bd. of Regents*, 878 F.3d 147, 157 (5th Cir. 2017) ("Informal understandings and customs … cannot be the source of an employee's property interest if the informal position conflicts with an official one.") (cleaned up).

course. It follows that to show a deprivation of such a property interest, James would have to show that she took a course which was designated as Advanced or Accelerated in the relevant academic year *and* that she did not receive Accelerated or Advanced credits for the course. James has failed to make such a showing here.

James took two classes which were designated as Accelerated in the relevant curriculum guides: (1) Chemistry for the 2015-2016 academic year, Doc. #185-11 at PageID 3567; and (2) Physics for the 2017-2018 academic year, *id.* at PageID 3640. She received Accelerated credit for both courses. Doc. #185-12. James also took five classes designated as Advanced in the relevant curriculum guides: (1) AP Biology for the 2016-2017 academic year, Doc. #185-11 at PageID 3608; (2) Algebra III for the 2016-2017 academic year, *id.*; (3) A.P.–U.S. History for the 2016-2017 academic year, *id.*; (4) AP Calculus for the 2017-2018 academic year, *id.* at PageID 3640; and (5) AP English Language & Composition for the 2017-2018 academic year, *id.* She received Advanced credit for all these courses. Doc. #185-12. In those instances where the rank points on her grade script depart from the relevant curriculum guide, such departures are in her favor.

James argues, however, that she "did not receive advanced rank points for Algebra II, Geometry and Spanish I — courses she took as part of the IB-MYP program." Doc. #234 at 3. James contends that "[t]hose courses were designated accelerated in CSD's 2012-2013 Curriculum Guide." *Id.* at 3–4. This contention fails both legally and factually.

First, and most fundamentally, James did not take Algebra II, Geometry, or Spanish I during the 2012-2013 academic year. She took Spanish I in the 2013-2014 academic year, Geometry (designated as CCSS Geometry) in the 2014-2015 academic year, and Algebra II in the 2015-2016 academic year. Doc. #185-12. Accordingly, she may not rely on the 2012-2013 Curriculum Guide as creating a property interest.

Even if she could rely on the 2012-2013 Curriculum Guide, the 2012-2013 Curriculum Guide did not provide that courses taken as a "part of" the IB or MYP programs were necessarily Advanced. Rather, the guide states that all IB "classes are classified as advanced classes." Doc. #185-10 at 3475. The guide then enumerates numerous courses, all with an "IB" prefix, as IB courses. *Id*. The "East Side High School Pre IB/IB Course of Study," which lists courses with and without "IB" Prefixes makes clear that not all courses taken by IB students are necessarily "IB" classes. *See id.* at PageID 3481. None of the "IB" prefix courses appear on James' grade script. *See* Doc. #185-12. Thus, James was not deprived of a property interest with respect to the assignment of rank points for these courses.

In sum, James has failed to assert a property interest based on her failure to be named salutatorian or on the assignment of rank points. Her procedural due process claims against the defendants therefore must fail.

**B. Substantive Due Process**

As noted above, the substantive due process element of the Fourteenth Amendment prohibits a government from depriving a person of a protected interest without a sufficient reason. When the right is not a "fundamental right" and the deprivation is individualized (rather than applied broadly) the deprivation must "shock the conscience." *Reyes v. N. Tex. Tollway Auth., (NTTA)*, 861 F.3d 558, 561–62 (5th Cir. 2017). But where there is no deprivation of a protected interest, a substantive due process claim must fail. *Cripps*, 819 F.3d at 232. Because James has not established the deprivation of a property interest, her substantive due process claims must also fail. Summary judgment on James' due process claims will be granted.

**VII**
**Equal Protection Claims**

"The Equal Protection Clause directs that persons similarly situated should be treated alike." *Anokwuru v. City of Hous.*, 990 F.3d 956, 965 (5th Cir. 2021). Thus, a plaintiff asserting

an equal protection claim must establish "that he was treated differently than persons similarly situated to him[ and] that such treatment stemmed from discriminatory intent." *Id.* The central purpose of the provision "is to prevent the States from purposefully discriminating between individuals on the basis of race." *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 353 (5th Cir. 2015). "Laws that explicitly distinguish between individuals on racial grounds fall within the core of that prohibition and are subject to strict scrutiny." *Id.* at 354 (cleaned up). To satisfy strict scrutiny review, "the burden is on the government to prove that its actions are narrowly tailored to achieve a compelling government interest." *Id.* (cleaned up).

Where, however, a governmental action is facially neutral (in that it does not classify based on race), the plaintiff must show that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose. *Id.* If the plaintiff makes these showings, the governmental action violates the Equal Protection Clause unless the action can survive strict scrutiny review; that is, unless it is narrowly tailored to achieve a compelling government interest. *Id.* If the plaintiff cannot show both discriminatory effect and purpose, the equal protection claim must fail unless the plaintiff can prove that the challenged action is not rationally related to a legitimate government purpose. *Id.*

James' equal protection claims seem to rest on four separate governmental actions: (1) the offering of Saxon courses at Cleveland High (rather than at East Side); (2) the awarding of Accelerated credit for Saxon courses which "were not approved by the MDE and were not listed in CSD's curriculum guides as accelerated courses;" (3) the classification of Algebra II and Creative Writing as Regular courses for East Side students; and (4) the awarding of the STAR Athlete Award to M.W. Doc. #234 at 24. While these policies arguably distinguish between students at Cleveland High and East Side (which was a one-race school), they do not facially distinguish based on race and, therefore, are facially neutral. *See Davis v. E. Baton Rouge Par.*

*Sch. Bd.*, 570 F.2d 1260, 1264 (5th Cir. 1978) (plan which placed less experienced teachers in "black schools" was facially neutral). Accordingly, James must show both discriminatory effect and discriminatory purpose or that the decisions were not rationally related to a legitimate governmental purpose.

### A. Discriminatory Effect

To show a discriminatory effect, the plaintiff must identify similarly situated persons outside her protected class who were treated better.[34] *Walker v. City of Mesquite*, 169 F.3d 973, 981 (5th Cir. 1999). There is no "precise formula to determine whether a plaintiff is similarly situated to comparators." *Stratta v. Roe*, 961 F.3d 340, 360 (5th Cir. 2020). Rather, a court should consider "the full variety of factors that an objectively reasonable decisionmaker would have found relevant." *Id.* (alteration omitted). A plaintiff "may show that [the defendant] treated [her] differently than other similarly situated individuals by naming such individuals or through the use of statistics." *Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir. 2001); *see Lewis*, 806 F.3d at 359–60 (citing *Chavez* for the proposition that "[t]he discriminatory-impact element of an equal protection claim may be satisfied with statistical evidence").

While the Fifth Circuit appears not to have addressed the similarly situated standard with respect to the assignment of class weights, it has demanded a high level of similarity in the educational context. *See Martinez v. New Deal Indep. Sch. Dist.*, 802 F. App'x 98, 100 (5th Cir. 2020) (transfer students not similarly situated for athletic eligibility purposes when they transferred

---

[34] In *Lewis*, the Fifth Circuit, citing a law review article, noted in dicta that "there is uncertainty in the law regarding the circumstances under which an equal protection plaintiff alleging racial discrimination is required to identify a similarly situated comparator group and the showing required to discharge this burden." *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 359 n.19 (5th Cir. 2015) (citing Giovanna Shay, *Similarly Situated*, 18 Geo. Mason L. Rev. 581 (2011)). The cited law review article explains that some courts "view 'similarly situated' as a threshold analysis that must be met in order to qualify for equal protection review" but argues that "properly understood, 'similarly situated' is not a threshold hurdle to equal protection analysis on the merits *in cases involving facial classifications*." Shay, *Similarly Situated*, 18 Geo. Mason L. Rev. at 587–88 (emphasis added). The article also acknowledges that "equal protection plaintiffs in cases that do not involve express categorizations … must first demonstrate that other 'similarly situated' individuals were treated differently." *Id.* Thus, there is no question that James must satisfy the similarly situated requirement to show discriminatory effect.

at different times, at different points in their academic careers, and after residing in the school district for different amount of times);[35] *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 414 (5th Cir. 2015) (plaintiffs failed to satisfy the similarly situated standard when the record contained no evidence that defendant softball coach "had ever encountered a situation in which a student signed out for lunch on a game day and failed to return in time for the team's roll call" as plaintiff had done); *id.* (students involved in altercation with plaintiff who expressed fear of plaintiff were not similarly situated with plaintiff, who expressed no fear of students); *C.H., II ex rel. L.H. v. Rankin Cnty. Sch. Dist.*, 415 F. App'x 541, 546 (5th Cir. 2011) (students involved in altercation were not similarly situated when one required medical attention and the other did not).

A demanding similarly situated standard is particularly necessary in the context of subjective academic decisions. *See Patel v. Tex. Tech Univ.*, 941 F.3d 743, 748 (5th Cir. 2019) (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 228 n.14 (1985), for the proposition that "even when student identifies possible academic comparators through statistical evidence, courts 'are not in a position to say' those students were 'similarly situated' for purposes of challenging academic decisions"); *Coleman v. Hinsdale Twp. High Sch. Dist. 86*, No. 07 C 1577, 2010 WL 3418272, at *3 (N.D. Ill. Aug. 26, 2010) ("[T]o prove that he was discriminated against he must, for example, identify another non-African-American student who failed to properly credit a quote in a paper submitted to Thelen for whom Thelen did not prepare a disciplinary referral and did give a zero grade."); *Hernandez v. Taylor*, No. 19-313, 2020 WL 4220088, at *5 (D. Ariz. July 23, 2020) (plaintiff required to show "students in the same academic predicament").

### 1. Accelerated points for Saxon courses

James takes issue with the assignment of Accelerated points for the Saxon courses because

---

[35] *Martinez* was a "class of one" equal protection claim. However, "[t]he same strict 'similarly situated' standard applies whether an equal protection claim is brought under a 'class of one' theory or a traditional theory of unlawful discrimination." *Newman v. Bradley*, No. 4:19-cv-304, 2020 WL 968164, at *1 (N.D. Ala. Feb. 28, 2020) (citing *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1204–05 (11th Cir. 2007)).

the classes were not designated as Accelerated in the relevant curriculum guides and otherwise were not Department of Education-approved classes. Doc. #234 at 25. But these claims must fail for lack of a similarly situated comparator. With respect to Department of Education approval, James cannot show that she (or any African American student) was denied credit for a course that was not state-approved.[36] As to the lack of Accelerated designation, the School District has introduced undisputed[37] evidence that the Saxon courses offered rigorous curriculums which justified Accelerated designations. James has offered no evidence that she took a course with a rigorous curriculum for which she was not awarded Accelerated or Advanced points. She, therefore, cannot establish a similarly situated comparator with respect to these claims.

### 2. Other East Side Accelerated courses

As explained above, East Side had a history of providing Accelerated or Advanced credit for certain classes (such as Creative Writing, Spanish II, and Algebra II) which were not so designated in the relevant curriculum guides. In seeking to reconcile the GPAs, the various administrators determined it was proper to give the East Side students Regular points for these courses because the curriculum for the courses did not justify Accelerated points. While James argues this was an equal protection violation, she has offered no evidence which would create a genuine issue of material fact that there was a similarly situated student from her class who took a course which was designated as Regular *and* which had a curriculum that would have justified the

---

[36] James points to some alleged comparators from earlier graduating classes. *See* Doc. #237 at 10–11. However, to the extent the School District was unaware of any errors, these are improper comparators. *See Vandiver v. Hardin Cnty. Bd. of Educ.*, 925 F.2d 927, 931 (6th Cir. 1991) ("Though the decision to grant credit for prior course work to other transferees thus appears to have been based upon a mistake of fact, we see nothing in the equal protection clause which requires us to compound the principal's error by forcing the school district to grant a similar exception in Brian's case now that the error has been discovered. … [T]he equal protection clause was not designed to remedy inadvertent distinctions, even among similarly situated persons.").

[37] To the extent James argues that the use of the state-approved course codes for the Saxon courses is evidence that the courses were not, in fact, more rigorous than the standard classes, such argument would fail. Beyond conflicting with her claim that the School District's offering of the Saxon courses was an equal protection violation because it resulted in more rigorous classes at Cleveland High, this argument is factually incorrect. As explained above, the School District used the state-approved course codes with an added "S." The course codes, therefore, were not identical.

receipt of Accelerated points.   Accordingly, this claim must fail.

### 3.   STAR Athlete award

Also, James takes issue with the decision to name M.W. the Star Athlete because the two had the same QPA.   But the only evidence of the criteria for the STAR Athlete selection is James' testimony that the award went to the student with the highest *GPA*, not the highest *QPA*.   M.W.'s final transcript shows a cumulative GPA of 3.90.   Doc. #185-21.   James' final transcript shows a cumulative GPA of 3.83.   Doc. #185-12.   Accordingly, the two may not be deemed similarly situated for the purpose of the STAR Athlete award.[38]   The equal protection claim based on such must fail in this respect.

### 4.   Saxon course offerings at Cleveland High

As explained above, the 9th and 10th grade Saxon math classes were offered at Cleveland High to students (like M.W. and W.M.) who participated in the academically rigorous STAR Program at Margaret Green.   But East Side students (such as James) who participated in the rigorous IB-MYP program while at D.M. Smith had no ability to take equivalent courses. Although James does not elaborate on this argument, she seems to raise two equal protection claims—that the exclusion of East Side students like her from the Saxon program was an equal protection violation and that the maintenance of the Saxon courses at Cleveland High (rather than East Side) without Accelerated math courses at East Side was itself an equal protection violation.

With respect to the exclusion of East Side students from the Saxon courses, James must show that East Side students are similarly situated to those white students who enrolled in the Saxon courses.   They are not.   Students who took the Saxon courses (both white and African

---

[38] Even if James could show differing treatment, she could not establish liability against any of the named defendants with respect to the STAR Athlete selection.   There is no evidence that any of the individual defendants played any role in the selection of the STAR Athlete which would rise to the level of personal involvement or otherwise acted with deliberate indifference so as impose supervisory liability.   Nor is there any evidence that the decision to award M.W. the STAR Athlete scholarship was made by a final policymaker so as to impose municipal liability on the School District.

American) participated in the academically rigorous STAR Program which fed into the Saxon coursework. East Side students, even those who participated in the MYP, were not a part of the STAR Program feeder. While both the MYP and STAR Programs were academically rigorous tracks, there is absolutely no indication they were the same, either in content or standards. The MYP, as noted above, was a program open to all. The STAR Program, in contrast, was a selection-based program. Doc. #185-16 at 90. James has made no attempt to compare the curriculums of the MYP and STAR Programs in a way which would allow this Court to conclude that the students were similarly situated for the purpose of taking the "rigorous" 9th and 10th grade math courses. Accordingly, the exclusive availability of the Saxon courses to STAR Program students therefore cannot support an equal protection claim.[39]

To the extent James challenges the School District offering the Saxon courses at Cleveland High without offering equivalent "rigorous" courses at East Side, such claim must also fail. Assuming without deciding that students at East Side and Cleveland are similarly situated for the purpose of an equal protection analysis, James still must show a constitutionally significant difference in treatment, that is, an adverse effect. *Lewis*, 806 F.3d at 362. To this end, the Court agrees with the defendants that James "offers no evidence there was any disparity among course offerings at the District's schools." *See* Doc. #189 at 19.

A policy has a discriminatory impact if it has a "disproportionately adverse effect." *Lewis*, 806 F.3d at 354. A policy may satisfy this standard if it affords students unequal educational opportunities based on their race. *Id*. at 361–62. In considering whether two schools offer equal educational opportunities, a court may consider, among other things, the "range" of course offerings at each institution. *United States v. Virginia*, 518 U.S. 515, 551 (1996);[40] *see Lewis*,

---

[39] James does not raise an equal protection challenge to the STAR Program's admission standards, although she may have been wise to do so. In *Cowan*, this Court found the STAR Program's enrollment statistics raised an inference of discrimination. *See Cowan*, 186 F. Supp. 3d at 609–10.

[40] *United States v. Virginia* involved a challenge to the exclusion of women from the Virginia Military Institute. 518

806 F.3d at 361 (in considering discriminatory effect, noting expert had "not researched the quality of instruction or the course offerings").    In the absence of specific evidence regarding course offerings and the quality of instruction, a court may also consider objective metrics, such as test scores of graduating students.    *Lewis*, 806 F.3d at 362.

Here, it is undisputed that Cleveland High offered two "rigorous" math courses which were unavailable at East Side.    James points to the testimony of Grierson, who testified that the offering of the Saxon courses created "inequities in the system" because the Saxon courses covered a different curriculum than courses offered at East Side.    *See* Doc. #230-5 at 179.    However, the Court is aware of no authority which stands for the proposition that *every* difference in class offerings deprives a student of equal educational opportunities.    Rather, the question must be whether "the range of curricular choices available" are the same.    *Virginia*, 518 U.S. at 551.    To this end, beyond pointing to Cleveland High's offering of two "rigorous" courses (which were on the same subject matter as courses offered at East Side), James has made absolutely no effort to compare the range of curricular choices between the two schools to allow the Court to conclude that the educational opportunities at Cleveland High were better than those at East Side.    Nor has she offered statistics (such as test scores) which would show the educational opportunities at the two schools differ.    Under these circumstances, the Court concludes that James has failed to establish a genuine issue of material fact that the lack of Saxon courses at East Side deprived her of equal educational opportunities.    But even assuming that she could show a discriminatory effect, her claim premised on the offering of the Saxon courses would still fail for lack of a discriminatory purpose.[41]

---

U.S. at 523–24.    The United States Supreme Court held that the exclusion of women was improper under the Equal Protection Clause and the remedy proffered by the state, an all-women program at a separate institution, did "not cure the constitutional violation, *i.e.*, it does not provide equal opportunity."    *Id*. at 534.    While the case involved a separate issue, this Court finds the Equal Protection comparison of the two programs to be instructive.

[41]    As noted below, a school district, like Cleveland, which engaged in de jure segregation, is under a continuing duty to avoid actions which re-establish the existence of a dual school system.    Factors bearing on the existence of a dual

## B. Discriminatory Purpose

Having found no discriminatory effect with respect to any of James' claims, the Court need not address the issue of discriminatory intent. *See Lewis*, 806 F.3d at 358 ("Because we resolve the district court's treatment of Lewis's alternative equal protection theory on the discriminatory-effect finding, we need not address … Lewis's proffered evidence of discriminatory purpose."). Nevertheless, out of an abundance of caution, the Court will consider whether James has shown a discriminatory purpose with respect to the Saxon classes.

"To establish discriminatory intent, a plaintiff must show that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group." *Fennell*, 804 F.3d at 412 (internal quotation marks omitted). Relevant factors to discriminatory intent include "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016). Even statements of non-decision makers may be relevant when there is a "show[ing] that the [non-decisionmakers'] sentiments can be attributed … to the state actors." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196–97 (2003). When an equal protection claim is asserted against an individual

---

system include "faculty, staff, transportation, extracurricular activities and facilities." *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430, 435 (1968). It is unclear whether course offerings may serve to re-establish the existence of a dual system or whether James asserts a claim based on the School District's ongoing duty to desegregate. *See United States v. City of Yonkers*, 197 F.3d 41, 50 (2d Cir. 1999) (assuming without deciding that "quality of education" may constitute a vestige of prior discrimination). But challenges to a school district's compliance with its ongoing duty to desegregate, particularly those that seek prospective injunctive relief (as here), must be asserted through intervention in the underlying desegregation case. *See Hines v. Rapides Par. Sch. Bd.*, 479 F.2d 762, 765 (5th Cir. 1973) ("[T]he proper course for parental groups seeking to question current deficiencies in the implementation of desegregation orders is for the group to petition the district court to allow it to intervene in the prior action."); *United States v. Perry Cnty. Bd. of Educ.*, 567 F.2d 277, 279 (5th Cir. 1978) ("[P]arents seeking to question deficiencies in the implementation of school desegregation orders should seek intervention rather than bring a class action."). To the extent James desires to challenge the School District's compliance with its ongoing duty to desegregate, she should seek intervention in *Cowan*.

defendant, the plaintiff must introduce evidence that the individual defendant acted with discriminatory intent or purpose. *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999).

James, citing *Price v. Austin Independent School District*, 945 F.2d 1307 (5th Cir. 1991), argues that because the School District was operating under a desegregation order, it has the burden of showing that its various actions were not taken with discriminatory intent. Doc. #236 at 24. The School District responds that the burden-shifting framework articulated in *Price* applies only to "attacks on desegregation cases." Doc. #253 at 3. Both parties are incorrect. But the Court concludes that the *Price* presumption does not apply here.

In *Price*, a group of plaintiffs challenged a student assignment plan proposed by the Austin Independent School District ("AISD"). 945 F.2d at 1310. The plaintiffs argued that, because AISD had previously operated a dual school system, "the burden of proof should have shifted to AISD to explain why its decision was not intentionally discriminatory." *Id*. at 1313. The Fifth Circuit, citing *Dayton Board of Education v. Brinkman*, 443 U.S. 526 (1979), and *Keyes v. School District*, 413 U.S. 189 (1973),[42] noted that when a school district had previously been found to have operated a dual school system, the district "is proscribed from taking even facially neutral actions which serve to reestablish the dual school system. Thus, once the plaintiffs have demonstrated a prima facie case of discriminatory effect … the burden of proof should … shift[] to [the district] to explain why its decision was not intentionally discriminatory." *Id*. However, the *Price* panel held that "[t]his burden-shifting analysis applies in cases of dual school systems prior to a finding of unitariness" but that "the analysis does not apply once a finding of unitariness has been entered." *Id*. Because AISD had previously been declared unitary, the Fifth Circuit

---

[42] The Fifth Circuit also included a "*see also*" cite to *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971). *Price*, 945 F.2d at 1313. *Swann* recognized that "[w]here it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown." 402 U.S. at 18. This presumption has no bearing on this case.

concluded that the burden shifting framework did not apply.  *Id*.

The presumption at issue in *Dayton* was not one of intent but *causation*.  443 U.S. at 537. As recognized by *Price*, a district which operated a segregated school system is under a "continuing duty to eradicate the effects of that system."  *Id*.  To determine whether *current* de facto segregation was a product of past intentional discrimination, the Supreme Court held that when a school district was previously intentionally segregated, "the systemwide nature of the violation furnishe[s] prima facie proof that current segregation in the … schools was *caused* at least in part by *prior* intentionally segregative official acts*.*"  *Id.* (emphasis added).  In this sense, the presumption "in *Dayton* was actually a burden imposed on [a] school district of 'showing that actions that increased or continued the effects of [a] dual system serve important and legitimate ends."  *Diaz v. San Jose Unified Sch. Dist*., 705 F.2d 1129, 1133 (9th Cir. 1983) (quoting *Dayton*, 443 U.S. at 538).  The case did not involve "a presumption shifting the burden of proving segregative intent, for proof of segregative intent in that case was unnecessary."  *Id*.; *see Dayton*, 443 U.S. at 538 ("[T]he measure of the post-*Brown I* conduct of a school board under an unsatisfied duty to liquidate a dual system is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system.").

*Keyes* involved a challenge in the Denver school district, which had never maintained a system of de jure discrimination, to the alleged segregation of African American and Hispanic students.  413 U.S. at 198.  The *Keyes* court held that "where no statutory dual system has ever existed, plaintiffs must prove not only that segregated schooling exists but also that it was brought about or maintained by intentional state action."  *Id*.  In establishing intent, the court held that a "finding of intentionally segregative school board actions in a meaningful portion of a school system … establishes … a prima facie case of unlawful segregative design on the part of school authorities" with respect to other segregated schools*. Id.* at 208.  The Supreme Court further held

that "though of different origins Negroes and Hispanos in Denver suffer identical discrimination in treatment when compared with the treatment afforded Anglo students" and thus should be considered together for the purpose of determining whether schools were segregated. *Id*. at 197–98.

In *United States v. Gregory-Portland Independent School District*, the Fifth Circuit recognized *Keyes* as supporting two presumptions. 654 F.2d 989, 996 (5th Cir. 1981). First, there was the express presumption that "intentional discrimination [exists] in all of a unitary system if it [is] found as to any substantial portion of that system." *Id*. The second, more implicit presumption, is that discrimination exists against one ethnic group when intentional discrimination has been established as to another ethnic group. *Id*. However, both presumptions are "grounded in the logical proposition that one may infer the motive upon which a given-decision maker acted in one situation from its known motive for acting in a similar one." *Id*. Accordingly, these presumptions assume "one given decision-maker." *Id*. The presumptions fail when the decision-makers are distinct. *Id*.; *see generally Lee v. Washington Cnty. Bd. of Educ.*, 625 F.2d 1235, 1237 (5th Cir. 1980) ("Proof of an *immediate past history* of racial discrimination alone can be sufficient to shift to the local board of education the burden of justifying its employment decisions by clear and convincing evidence.") (emphasis added).

Here, James has offered absolutely no evidence about the decision-making process involving the creation of the STAR Program (and by extension the creation of the Saxon math courses). The Court does not know who the decisionmakers were (so as to decide whether a *Keyes* presumption is appropriate) or even *when* the decision was made. While the decision was undoubtedly made while the School District maintained vestiges of discrimination, this fact alone is insufficient to infer the existence of discriminatory intent. *See Taylor v. Ouachita Par. Sch. Bd.*, 648 F.2d 959, 968 (5th Cir. 1981) (evidence that two districts with overlapping attendance

zones had failed to eradicate vestiges of de jure segregation did not support finding of intent to discriminate with respect to overlapping zones); *Pugh v. Byrd*, 574 F. App'x 505, 510 (5th Cir. 2014) ("[T]he Plaintiffs contend that the alleged disparate treatment *is* evidence of discriminatory intent. This argument is conclusory and is insufficient to satisfy their burden of demonstrating a genuine issue of material fact regarding discriminatory intent …."). Nor has James introduced any evidence regarding the decision to continue operating the Saxon courses after they were removed from the relevant curriculum guides. Accordingly, James cannot establish discriminatory intent with respect to the creation of the Saxon program. Therefore, she cannot establish an equal protection violation in this respect.

## VIII
## Conclusion

James has failed to establish a constitutional violation, which is a prerequisite for all of her claims. Accordingly, her claims fail and the defendants' motions for summary judgment [185][187][188][191][193] are **GRANTED**. A final judgment will issue separately.

**SO ORDERED**, this 30th day of July, 2021.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**

# APPENDIX A

| GRADE SCRIPTS AS CALCULATED ON MAY 17, 2018 | | | | | |
|---|---|---|---|---|---|
| Course | Guide Designation | James*<br>GPA: 3.83<br>QPA: 4.33 | W.M.**<br>GPA: 3.90<br>QPA: 4.33 | M.W.**<br>GPA: 3.90<br>QPA:4.34 | K.B.*<br>GPA: 3.92<br>QPA: 4.44 |
| AP ENG LANGUAGE & COMPOSITION | AP | AP | AP | | AP |
| AP CALCULUS | AP | AP | AP | AP | AP |
| ECONOMICS | R | R | R | R | R |
| PHYSICS | AC | AC | | | AC |
| U.S. GOVERNMENT | R | R | R | R | R |
| AP U.S. HISTORY | AP | AP | | | AP |
| ALGEBRA III | AP | AP | AP | AP | AP |
| AP BIOLOGY | AP | AP | AP | AP | AP |
| CREATIVE WRITING | R | R | | | R |
| ENGLISH III | R | R | R | R | R |
| HUMAN A & P | R | AP | | AP | AP |
| ALGEBRA II | R | R | | | R |
| CHEMISTRY | AC | AC | AC | AC | AC |
| ENGLISH II | R | R | R | R | R |
| GEOGRAPHY | R | R | R | R | R |
| SPANISH II | R | R | R | R | R |
| WORLD HISTORY | R | R | R | R | R |
| BIOLOGY I | R | R | R | R | R |
| CCSS GEOMETRY | R | R | | | R |
| ENGLISH I | R | R | R | R | R |
| UNITED STATES HISTORY | R | R | R | R | R |
| 8-ALGEBRA I | R | AC | | | AC |
| SPANISH I | R | R | R | R | R |
| 7-PRE ALGEBRA | R | AC | | | AC |
| SAXON GEOMETRY | | | AC | AC | |
| SAXON ALGEBRA II | | | AC | AC | |
| 8 SAXON ALGEBRA 8 | | | AC | AC | |
| SAXON 7 PRE ALGRA | | | AC | AC | |

\*    Attended East Side High School before consolidation
\*\* Attended Cleveland High School before consolidation